# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| TIMOTHY RICHARDSON, as Trustee of the Richardson Living Trust, Derivatively on Behalf of MONEYGRAM INTERNATIONAL, INC., | ) ) ) ) ) ) | |
| *Plaintiff*, | ) ) ) | |
| v. | ) ) | C.A. No. 2019-1015-SG |
| J. COLEY CLARK, VICTOR W. DAHIR, ANTONIO O. GARZA, THOMAS M. HAGERTY, W. ALEXANDER HOLMES, SCOTT L. JAECKEL, SETH W. LAWRY, ANN MATHER, PAMELA H. PATSLEY, MICHAEL P. RAFFERTY, GANESH B. RAO, W. BRUCE TURNER, and PEGGY VAUGHAN, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants*, | ) ) | |
| and | ) ) | |
| MONEYGRAM INTERNATIONAL, INC., | ) ) ) | |
| *Nominal Defendant*. | ) ) ) | |

## MEMORANDUM OPINION

Date Submitted: September 4, 2020
Date Decided: December 31, 2020

Kevin H. Davenport, Samuel L. Closic, and Jason W. Rigby, of PRICKET, JONES & ELLIOTT, P.A., Wilmington, Delaware; OF COUNSEL: Frank R. Schirripa and Daniel B. Rehns, of HACH ROSE SCHIRRIPA & CHEVERIE LLP, New York, New York, *Attorneys for Plaintiff*.

A. Thompson Bayliss and Joseph A. Sparco, of ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Attorneys for Defendants*.

GLASSCOCK, Vice Chancellor

This matter involves a company, MoneyGram International, Inc. ("MoneyGram" or the "Company") whose business is to facilitate the transfer of payments among businesses and individuals, worldwide. Such a business offers a real benefit to its consumers, obviously, but with a dark side—it can also be used as a platform for fraud and money laundering. Effective controls to prevent agents of the company and others from using its services to abet wrongdoing are difficult to implement, as this litigation reveals.

MoneyGram was alleged by federal prosecutors in 2012 to have failed to comply with anti-money-laundering ("AML") requirements, and with aiding and abetting wire fraud. The company avoided prosecution by entering a deferred prosecution agreement (the "DPA") which required a large payment meant for restitution to those customers injured, as well certain other actions by MoneyGram to prevent future wire fraud and money-laundering. Over the next several years, MoneyGram made efforts to comply with the duties imposed on it by the DPA. It made progress, but ultimately it failed. In 2017, regulators again threatened the Company with prosecution on the original charges, and eventually MoneyGram was forced to extend the DPA (the "Amended DPA") through 2021 and pay an additional $125 million in restitution.

1

The Plaintiff here is a MoneyGram stockholder. It[1] seeks to proceed derivatively on behalf of the Company. It notes that, while the MoneyGram board of directors (the "Board") received numerous presentations about the successes and failures of management to implement the requirements of the DPA, the directors failed to act to ensure that MoneyGram fully complied; leading to the Amended DPA and its substantial fine. It also notes that the Board failed to insure that shortcomings in software employed by the company to reduce fraud, once discovered, were fully disclosed to regulators. It acknowledges that the directors are exculpated from liability absent bad faith, but alleges that the inadequate actions referred to above are sufficient to imply bad faith in exercise of oversight requirements, under the rubric of *Caremark* and its progeny. It also brings breach of duty claims against officers of MoneyGram based on failure to comply with the DPA.

This is a derivative action. It is not brought on behalf of the victims of unscrupulous individuals who used MoneyGram's services in pursuit of fraud. It is designed to cause the directors and officers of MoneyGram to make good damages the company suffered, due to their failure to prevent the actions referred to above. These causes of action, to the extent they exist, are assets of MoneyGram, subject to the disposal of the Board. Where the majority of directors are disabled from

---

[1] More precisely, the Plaintiff is the Trustee of a Trust holding stock. For shorthand purposes I consider the Trust to be the party-in-interest, and refer to the Plaintiff by the non-gendered pronouns.

applying business judgement to such disposal, however, a stockholder may be able to proceed on the claims derivatively.

Rule 23.1 serves to strike a balance between vindication of the proposition that a company is run by its directors, including with respect to engaging litigation assets, and the truism that situations exist where those directors are incapable of deploying the assets in the corporate interest. The Rule requires that a stockholder advocating corporate litigation make a demand on the board, or demonstrate that demand would be futile. In the latter case, the stockholder-plaintiff may proceed derivatively.

The Plaintiff did not make a demand upon the Board. The sole ground asserted by the Plaintiff as to why demand is futile is that the company's directors face liability in this action,[2] inhibiting their ability to act in the interest of MoneyGram. In such a situation, I must evaluate to the complaint to see if it pleads with particularity facts which if true (together with reasonable inferences therefrom) pose a substantial likelihood of personal liability on the part of a majority of the directors. Here, the facts are that MoneyGram took steps to comply with the DPA, the Board made itself aware of those steps and their shortcomings, but failed to ensure full compliance, leading to the Amended DPA. Even considering all the acts

---

[2] The Plaintiff also appears to allege that a single director lacks independence because of his executive compensation arrangement. *See* Pl.'s Verified Stockholder Derivative Compl. ¶ 156, Dkt. No. 1.

of the Board along with its Directors' alleged failures to act, individually and together, I cannot conclude that a majority of the directors acted in bad faith. A conscious failure to act in the face of a known duty can amount to bad faith. Here, the Complaint describes directors who oversaw a company struggling to implement long-term reforms; a Board that kept itself apprised of progress, or lack thereof, and which failed to take remedial or punitive efforts against management failures. The Director Defendants on the alleged facts may be plausibly accused of feckless oversight and lack of vigor; they may have been wistless or overly reliant on management. These facts, I find, do not implicate bad faith, however. Bad oversight is not bad-faith oversight, and bad oversight is the most that these facts could plausibly imply.[3] Accordingly, I find that the Plaintiff has failed to show that demand is excused pursuant to Chancery Court Rule 23.1, and the matter is dismissed.

My reasoning follows.

---

[3] Of course, I base this determination on mere allegations and the inferences therefrom. I do not mean to imply that bad oversight has been demonstrated and acknowledge the argument, raised by counsel for the Defendants, that his clients' actions were instead exemplary.

4

# I. BACKGROUND[4]

*A. The Players*

Nominal Defendant MoneyGram is a Delaware corporation headquartered in Dallas, Texas.[5] MoneyGram is described in the Complaint as a leading global financial technology company that provides people and businesses with fast and convenient ways to send money and make payments around the world.[6] MoneyGram is a "controlled company" for purposes of NASDAQ listing standards.[7] From 2010 to 2019, Moneygram's Board had between eight and ten members.[8] During that time, the Board maintained several standing committees, relevantly the Audit Committee, the Human Resources and Nominating Committee (the "HRN"), and, as discussed further below, an independent Compliance and Ethics Committee (the "Compliance Committee").[9]

Plaintiff Timothy Richardson is Trustee of the Richardson Living Trust.[10] The Trust is a current shareholder of MoneyGram, has been a shareholder of

---

[4] I draw all facts from the Pl.'s Verified Stockholder Derivative Compl., Dkt. No. 1, (the "Complaint" or "Compl.") and documents incorporated therein. *See In re Morton's Rest. Grp., Inc. S'holder Litig.*, 74 A.3d 656, 658–59 (Del. Ch. 2013) (permitting consideration of documents incorporated into complaint in motion to dismiss). As discussed further below, all well-pled facts are assumed true for purposes of this motion.

[5] Compl. ¶ 17. MoneyGram's common stock trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "MGI." *Id.*

[6] *Id.* ¶ 17.

[7] *Id.*

[8] *Id.* ¶ 18.

[9] *Id.*

[10] *Id.* ¶ 16.

MoneyGram at all times relevant to the allegations in the Complaint, and will continue to be a shareholder of MoneyGram through the conclusion of this litigation.[11]

Defendant J. Coley Clark has been a director of the Company since 2010.[12] Clark has also served on the Board's HRN Committee, of which he now serves as Chair, since 2010, and on the Audit Committee for the fiscal years 2013 and 2014.[13] Between 2014 and 2018, Clark attended all but two Board meetings and six Compliance Committee meetings.[14] Clark also signed Form 10-Ks for the years 2010 through 2018.[15]

Defendant Victor W. Dahir has been a director of the Company since 2010.[16] Dahir has also served on the Audit Committee since 2010, and now serves as Chair of that committee.[17] Between 2014 and 2018, Clark attended all but one Board

---

[11] *Id.*
[12] *Id.* ¶ 22.
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.* ¶ 23.
[17] *Id.*

meeting and six Compliance Committee meetings.[18]  Dahir also signed Form 10-Ks for the years 2010 through 2018.[19]

Defendant Antonio O. Garza has been a director of the Company since 2012.[20] Garza has served on the HRN since 2012, and as Chair of the Compliance Committee since at least 2014. Between 2014 and 2018, Garza attended all but two Board meetings and all but one Compliance Committee meeting. Garza also signed Form 10-Ks for the years 2012 through 2018.[21] Between 2012 and 2018, MoneyGram paid Garza over $1.5 million in cash, stock and other benefits.[22]

Defendant Thomas M. Hagerty was a director of the Company from 2008 until May 2015.[23] Hagerty attended three Board meetings and four Compliance Committee meetings in 2014. Hagerty also signed Form 10-Ks for the years 2010 through 2014.[24]

Defendant Scott L. Jaeckel was a director of the Company from 2008 until May 2013.[25]  Jaeckel served as a member of the HRN Committee from at least 2009

---

[18] *Id.*
[19] *Id.*
[20] *Id.* ¶ 24.
[21] *Id.*
[22] *Id.*
[23] *Id.* ¶ 25.
[24] *Id.*
[25] *Id.* ¶ 26.

7

until he resigned from the Board. Jaeckel also signed Form 10-Ks for the years 2010 through 2012.

Defendant Seth W. Lawry has been a director of the Company since 2008.[26] Lawry served on the HRN Committee as Chair from 2008 to 2012 and as a member from 2012 through 2018, and has been a member of the Compliance Committee since at least 2014.[27] Between 2014 and 2018, Lawry attended all but three Board meetings and all but three Compliance Committee meetings. Lawry also signed Form 10-Ks for the years 2010 through 2018.[28]

Defendant Ann Mather was a director of the Company from 2010 until May 2013.[29] Mather served on the Audit Committee throughout her tenure on the Board, and served as Chair of the committee from 2010 through 2012.[30] Mather also signed Form 10-Ks for the years 2010 through 2012.[31]

Defendant Michael P. Rafferty has been a director of the Company since 2016.[32] Between the start of his term on the Board in May 2016 and 2018, Rafferty attended all but two Board meetings—one of which was a meeting of a Special

---

[26] *Id.* ¶ 27.
[27] *Id.*
[28] *Id.*
[29] *Id.* ¶ 28.
[30] *Id.*
[31] *Id.*
[32] *Id.* ¶ 29.

8

Committee of the Board—and five Compliance Committee meetings.[33] Rafferty also signed Form 10-Ks for the years 2016 through 2018.

Defendant Ganesh B. Rao has been a director of the Company since 2008.[34] Rao served on the Compliance Committee since at least 2014.[35] Between 2014 and 2018, Rao attended every Board meeting, and all but five Compliance Committee meetings.[36] Rao also signed Form 10-Ks for the years 2010 through 2018.[37]

Defendant W. Bruce Turner has been a director of the Company since 2010.[38] Turner has served on the Audit Committee since he joined the Board in 2010, and has been a member of the Compliance Committee since at least 2014. Turner attended every Board meeting and every Compliance Committee meeting between 2014 and 2018. Turner also signed Form 10-Ks for the years 2010 through 2018.

Defendant Peggy Vaughan has been a director of the Company since 2014.[39] Vaughan has served on the Audit Committee since she joined the Board in 2014. Between 2014 and 2018, Vaughan attended all but one Board meeting and nine

---

[33] *Id.*
[34] *Id.* ¶ 30.
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.* ¶ 31.
[39] *Id.* ¶ 32.

9

Compliance Committee meetings. Vaughan also signed Form 10-Ks for the years 2013 through 2018.

Defendant W. Alexander Holmes has served as MoneyGram's Chief Executive Officer ("CEO") since January 2016 and as Chairman of the Board since February 2018.[40] He has been a director of the Company since 2015.[41] He joined the Company in 2009, previously served as the Company's Executive Vice President and Chief Financial Officer ("CFO") beginning in March 2012, and assumed the additional role of Chief Operating Officer in February 2014.[42] Between 2014 and 2018, Holmes attended all but one Board meeting and all but one Compliance Committee meeting.[43]

Defendant Pamela H. Patsley ("Patsley") served as the Company's CEO from September 2009 through December 31, 2015, and as Executive Chairman of the Board from January 1, 2016 through February 2018.[44] She was a director of the Company from 2009 through February 2018.[45] Between 2014 and 2017, Patsley

---

[40] *Id.* ¶ 19.
[41] *Id.*
[42] *Id.*
[43] *Id.* ¶.
[44] *Id.* ¶ 20.
[45] *Id.*

attended all Board meetings and all Compliance Committee meetings. Patsley signed Form 10-Ks for the years 2009 through 2016.[46]

Holmes and Patsley are hereinafter referred to collectively as the "Officer Defendants." Clark, Dahir, Garza, Hagerty, Jaeckel, Lawry, Mather, Rafferty, Rao, Turner and Vaughan are collectively referred to as the "Director Defendants."

*B. The Script*

1. <u>The Color of Money</u>

MoneyGram is one of the world's largest money transfer companies.[47] Through a network of MoneyGram agents, customers can transfer large sums of money across borders within minutes.[48] The Company's Global Funds Transfer segment, and specifically its money transfer business, has accounted for over 80% of MoneyGram's revenue every year since 2011, and at least 87% of revenue every year since 2013, representing well over a billion dollars in annual revenues.[49] The vast majority of that revenue comes from fees charged to customers per transfer.[50] While the cost varies by amount and location, in the United States MoneyGram charges a flat five-dollar fee for transfers ranging from $1 to $49, a flat $11.50 fee

---

[46] *Id.*
[47] *Id.* ¶ 48.
[48] *Id.* ¶ 3.
[49] *Id.* ¶ 48.
[50] *Id.*

11

for transfers ranging from $50 to $499, and a 2% fee on transfers of $500 and up, with a cap at $10,000 per transfer.[51]

## 2. A Risky Business

The money transfer industry is not without risk, however. Large money transmitters like MoneyGram remain attractive vehicles for money laundering.[52] As a result, MoneyGram is subject to government regulation, especially with respect to its internal controls and compliance systems.[53] Under the Bank Secrecy Act, for example, MoneyGram has ongoing obligations to maintain customer identification and transaction information and record transactions that either appear suspicious or exceed $10,000.[54] MoneyGram is also held accountable for the conduct of its many agents, which are subject to the same recording and reporting requirements.[55] Failure to comply with these regulations, whether by MoneyGram itself or any of its agents around the world, can lead to civil fines, the suspension or revocation of essential business licenses, and even criminal prosecution.[56] Thus, noncompliance with AML requirements presents a significant risk to MoneyGram's business model.

---

[51] *Id.*
[52] *See id.* ¶ 49.
[53] *Id.* ¶ 54.
[54] *Id.* ¶ 55.
[55] *Id.* ¶¶ 53, 58.
[56] *Id.* ¶¶ 47, 53, 59. As MoneyGram's Form 10-Ks through 2018 acknowledge: "a failure by [MoneyGram or its] agents to comply with applicable laws and regulations also could seriously damage our reputation and result in diminished revenue and profit and increase our operating costs and could result in, among other things, revocation of required licenses or registrations, loss of

12

### 3. Losin' It

Over the past decade, these risks have become reality, as MoneyGram has been faced with several civil and criminal enforcement actions. First, in 2009, MoneyGram settled a lawsuit with the Federal Trade Commission (the "FTC") in which the FTC alleged that MoneyGram's own agents assisted in perpetrating fraud against MoneyGram users.[57] The settlement agreement required MoneyGram to establish a comprehensive anti-fraud program that included training and education for employees and monitoring and disciplinary action for its agents.[58]

Government action against MoneyGram continued. Next, the Department of Justice (the "DOJ") and the U.S. Attorney's Office for the Middle District of Pennsylvania ("MDPA") pursued a criminal investigation.[59] Ultimately, MoneyGram was charged with two felony counts for aiding and abetting wire fraud and failing to maintain effective AML procedures.[60] These charges led to MoneyGram entering the DPA in 2012.[61] The DPA had a five-year term and required MoneyGram to dedicate $100 million to provide redress for victims of fraud

---

approved status, termination of contracts with banks or retail representatives, administrative enforcement actions and fines, class action lawsuits, cease and desist orders and civil and criminal liability. The occurrence of one or more of these events could have a material adverse effect on our business, financial condition and results of operations." *Id.* at ¶ 60.

[57] *Id.* ¶¶ 62–63.
[58] *See id.*
[59] *Id.* ¶ 64.
[60] *Id.*
[61] *Id.* ¶ 65.

enabled by usage of the Company's services.[62]  Additionally, MoneyGram had to implement the following policies and procedures: (1) create a compliance and ethics committee (the "Compliance Committee") responsible for ensuring that the Company is in compliance with all aspects of the DPA (2) require MoneyGram agents worldwide to adhere to U.S. anti-fraud and AML standards; (3) retain an independent compliance monitor (the "Monitor") to oversee, evaluate, and report to the DOJ on MoneyGram's compliance efforts; and (4) adopt an incentive structure that allowed MoneyGram to claw back bonuses for executives later deemed to have contributed to compliance failures.[63]

### 4. All the Right Moves

During the DPA's term, MoneyGram took steps toward closing the gaps in its compliance program.  Shortly after entering the DPA, MoneyGram established the Compliance Committee.[64]  The Compliance Committee's charter specifies that the Compliance Committee is responsible for "adopt[ing] . . . a worldwide anti-fraud and AML standard for [MoneyGram's] agents," "review[ing] and submit[ting] all reports required under the DPA," and making regular reports to the Board.[65]  Board

---

[62] *Id.*

[63] *Id.* ¶¶ 40, 65, 73. At all times relevant to the allegations in the Complaint, the Compliance Committee included defendants Holmes, Patsley, Clark, Dahir, Garza, Hagerty, Lawry, Rafferty, and Vaughan.  Rao and Turner joined the committee in 2014.

[64] *Id.* ¶ 39.

[65] *Id.* ¶ 39.

14

and committee meeting materials reflect that both the full Board and the Compliance Committee met regularly throughout the relevant time period and the Board was informed of the Compliance Committee's efforts.[66] Presentations to the Compliance Committee and the Board describe MoneyGram's progress under the DPA:

- developing a centralized Compliance policy and annual Compliance Plan;[67]

- commissioning regular independent AML audits to identify high priority issues;[68]

- upgrading and replacing compliance and management related software;[69]

- expanding its "Mystery Shopping" agent review program internationally;[70]

- enhancing its Agent Risk Assessment Model;[71]

- requiring agents and employees complete fraud prevention and AML training;[72] and

- restricting, suspending, or terminating MoneyGram locations that fail to comply with anti-fraud and AML laws.[73]

---

[66] *Id.* ¶¶ 79–132. The Board also received reporting from the Audit and HRN Committees.

[67] Transmittal Aff. Of Joseph A. Sparco in Supp. of Opening Br. in Supp. of Defs.' Mot. to Dismiss, Ex. 25 [hereinafter Sparco Aff.].

[68] Compl. ¶ 97. These audits were reviewed by the Audit Committee and presented to the Board. *Id.* ¶ 42.

[69] Sparco Aff., Ex. 15.

[70] *Id.*, Ex. 16.

[71] *Id.*, Ex. 18.

[72] *Id.*

[73] *Id.*, Ex. 24.

15

5. Mission Impossible?

Despite taking these and other steps, MoneyGram had difficulty meeting the requirements of the DPA. Consumer complaints and suspicious activity did not consistently decrease. For example, after implementing a risk management platform to intercept fraud ("Actimize"), fraud complaints actually increased in 2015.[74] In 2017, as the DPA was nearing the end of its initial term, an independent auditor informed the Board that many problems remained with its AML program.[75]

At this point, MoneyGram had begun to engage with the DOJ and MDPA regarding the DPA through its outside counsel.[76] MoneyGram made clear to the DOJ and MDPA that it believed it had "substantially completed the obligations under the DPA and a substantial majority of the recommendations of the Compliance Monitor."[77] However, at the same meeting, on October 10, 2017, the Board also discussed the possibility of extending the DPA.[78]

MoneyGram was ultimately unsuccessful in meeting the requirements of the DPA.[79] Only two weeks after discussing the possibility of an extension, the Board

---

[74] *See, e.g.*, Compl. ¶¶ 83, 92, 96, 120. Actimize was later replaced with a different software, described as "more precise," in October 2016. Sparco Aff., Ex. 33.
[75] Compl. ¶¶ 115–16.
[76] *See id.* ¶¶118–21.
[77] *Id.* ¶ 121.
[78] *Id.*
[79] *Id.* ¶ 133.

learned that the DOJ's position was that MoneyGram had violated the DPA.[80] One of the main compliance issues identified by the DOJ and MDPA was the implementation of Actimize, which not only failed to prevent fraud, but allowed more fraud to occur.[81]

### 6. Mission Impossible—Fallout

Following discussions with the DOJ and MDPA,[82] the DPA was extended to 2021, as the Amended DPA.[83] As part of the Amended DPA MoneyGram agreed to enhanced compliance obligations and to provide an additional $125 million for fraud victim restitution—bringing the Company's forfeiture total up to nearly $250 million.[84]

### C. Post-Production

The Plaintiff initiated this action on December 18, 2020.[85] I heard oral argument on the Defendants' Motion to Dismiss on September 4, 2020,[86] and consider the matter submitted for decision as of that date.

---

[80] *Id.* ¶ 122.

[81] *Id.* ¶ 124.

[82] The FTC also instituted a fourth proceeding against MoneyGram for violations of the 2009 FTC Order around this time, resulting in a Stipulated Order and extended injunction. *See* Sparco Aff., Ex. 20 (FTC'S Unopposed Motion for Entry of Stipulated Order for Compensatory Relief and Modified Order for Permanent Injunction).

[83] *Id.* ¶ 135.

[84] *Id.* ¶ 10.

[85] *See generally* Compl.

[86] *See generally* Tr. of Oral Arg. Held via Zoom on Defs.' Mot. to Dismiss, Dkt. No. 43; Judicial Action Form, Dkt. No. 42.

## II. ANALYSIS

The Complaint asserts two derivative claims; one for breach of fiduciary duty against the Director Defendants and one for breach of fiduciary duty against the Officer Defendants.[87]  The Defendants have moved to dismiss the Complaint pursuant to both Court of Chancery Rule 23.1 for failure to make a demand on the Board and Rule 12(b)(6) for failure to state a claim.[88]

### A. Relevant Legal Standard

Under Delaware law, "[t]he business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors."[89]  As such, it is typically the board's prerogative to determine whether the corporation initiates and maintains a lawsuit.[90]  In order "to displace the board's authority over a litigation asset and assert the corporation's claim," a derivative plaintiff must do one of two things.[91]  Either the plaintiff may make a pre-suit demand on the board, requesting that it bring the action on behalf of the company, then demonstrate that the demand was wrongfully refused by the board, *or* the plaintiff may plead that such a demand

---

[87] *See* Compl. ¶¶ 183–97.  As CEO and Chairman of the Board, Holmes is a defendant to both counts.

[88] Opening Br. in Support of Defs.' Mot. to Dismiss, Dkt. No. 19 [hereinafter Defs.' Op. Br.].

[89] 8 *Del. C.* § 141(a).

[90] *Hughes v. Hu*, 2020 WL 1987029, at *9 (Del. Ch. Apr. 27, 2020) ("Directors of Delaware corporations derive their managerial decision making power, which encompasses decisions whether to initiate, or refrain from entering, litigation, from 8 *Del. C.* § 141(a)." (quoting *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981))).

[91] *Id.* at *10 (citing *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984)).

18

would be futile because a majority of "the directors are incapable of making an impartial decision regarding such litigation."[92]

Where a plaintiff pleads demand futility, Court of Chancery Rule 23.1 requires the plaintiff to "allege with particularity . . . the reasons for the plaintiff's failure to obtain the action or for not making the effort [of placing a demand on the board]."[93] To plead demand futility, this Court requires "particularized factual allegations" creating a "reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[94] A director is interested if she "will receive a personal financial benefit from a transaction that is not equally shared by the stockholders," or if "a corporate decision will have a materially detrimental impact on [the] director, but not on the corporation and the stockholders."[95] A director lacks independence if she is "so beholden to an interested director" that "her discretion would be sterilized."[96]

---

[92] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).
[93] Ct. Ch. R. 23.1.
[94] *Rales*, 634 A.2d at 934.
[95] *Id.* at 936.
[96] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004) (internal quotation marks omitted).

19

"[T]he pleading burden imposed by Rule 23.1 . . . is more onerous than that demanded by Rule 12(b)(6)."[97] "Though a complaint may plead a 'conceivable' allegation that would survive a motion to dismiss under Rule 12(b)(6), 'vague allegations are . . . insufficient to withstand a motion to dismiss pursuant to Rule 23.1.'"[98] In sum, while a derivative plaintiff "need not plead evidence," they "must comply with stringent requirements of factual particularity that differ substantially from . . . permissive notice pleadings."[99] In meeting the pleading requirements under both rules, however, plaintiffs are entitled to all reasonable inferences in their favor.[100]

### B. Demand is not Excused as to Count I

Here, the Plaintiff pleads demand futility, arguing that a majority of the members of the Board are incapable of making the decision as to whether the Company should pursue the litigation.[101] I therefore examine the Director

---

[97] *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *6 (Del. Ch. Oct. 12, 2011) (internal alterations omitted) (quoting *McPadden v. Sidhu*, 964 A.2d 1262, 1269 (Del. Ch. 2008)).

[98] *Id.* (quoting *McPadden*, 964 A.2d at 1269). As explained in *In re Goldman Sachs Grp., Inc.*, "[t]his difference reflects the divergent reasons for the two rules: Rule 12(b)(6) is designed to ensure a decision on the merits of any potentially valid claim, excluding only clearly meritless claims; Rule 23.1 is designed to vindicate the authority of the corporate board, except in those cases where the board will not or (because of conflicts) cannot exercise its judgment in the interest of the corporation." *Id.*

[99] *Hughes v. Hu*, 2020 WL 1987029, at *10 (Del. Ch. Apr. 27, 2020) (citing *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984); *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000)).

[100] *In re MetLife Inc. Derivative Litig.*, 2020 WL 4746635, at *11 (Del. Ch. Aug. 17, 2020).

[101] Compl. ¶¶ 212–30.

Defendants' ability to bring business judgement to bear under *Rales*.[102]   Because directors are individuals, a showing of incapacity is required for each, composing a majority of a board, to excuse demand.  Here, the Plaintiff addresses that burden by pleading with particularity that each Director Defendant was on the Board and/or the relevant committees, and attended pertinent meetings, during some or all of the term of the DPA, during which the Board's actionable deficiencies supposedly occurred.  Accordingly, I follow the Complaint and the parties' briefing in considering futility as to all members of MoneyGram's Board of Directors at the time litigation was initiated, based on the collective action of the Defendant Directors during the tenure of the DPA.  Thus, the Demand Board includes Holmes, Clark, Dahir, Garza, Lawry, Rafferty, Rao, Turner and Vaughan.  Because the Board consisted of nine members at the time the Plaintiff commenced this action, the Complaint must contain particularized allegations disqualifying at least five members from considering a pre-suit demand.

The Plaintiff does not challenge the independence of a majority of the Board.  Instead, the Plaintiff alleges that a majority of the Demand Board is interested in the outcome of the litigation, because they face "a substantial likelihood of liability" for the claims asserted in the Complaint.[103]   Mere "potential directorial liability is

---

[102] *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993).
[103] Compl. ¶ 153; *see also Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993).

21

insufficient to excuse demand."[104] The fact that wrongdoing is alleged against the directors themselves or that directors are named defendants in an action does not by itself deprive them of independence;[105] otherwise, compliance with Rule 23.1 in derivative pleadings would be self-proving. Instead, a plaintiff must plead facts implying a substantial likelihood of directorial liability to satisfy the rule.[106]

The Plaintiff's underlying theory of liability is based on failure by the Board and certain officers to exercise oversight sufficient to comply with their fiduciary duties. To establish liability under this theory, espoused in *In re Caremark Int'l Inc.*,[107] a plaintiff must allege particularized facts showing that "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee operations thus disabling themselves from being informed of risks or problems requiring their attention."[108] MoneyGram's certificate of incorporation

---

[104] *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *18 (Del. Ch. Oct. 12, 2011).

[105] *See Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *27 (Del. Ch. June 15, 2011); *Jacobs v. Yang*, 2004 WL 1728521, at *6 n.31 (Del. Ch. Aug. 2, 2004).

[106] *See In re Goldman Sachs*, 2011 WL 4826104, at *18.

[107] 698 A.2d 959 (Del. Ch. 1996). While the Complaint nowhere states that it is relying on *Caremark*, there are no allegations of self-dealing or waste. Instead, the Plaintiff alleges that the Defendants "engaged in conduct that is not a legitimate exercise of business judgment which resulted in breach of the DPA and MoneyGram's entry into the Amended DPA." *See, e.g.*, Opp'n to Defs.' Mot. to Dismiss Pl.'s Verified Shareholder Derivative Compl. 21 [hereinafter Pl.'s Opp'n Br.].

[108] Stone v. Ritter, 911 A.2d 362, 370 (Del. 2006).

also contains a Section 102(b)(7) provision that exculpates the Company's directors from liability except for breaches of the duty of loyalty.[109] Accordingly, to establish a substantial risk of director liability under *Caremark*, the Complaint must plead further, and with the requisite particularity, that the Defendants acted in bad faith—that is "that the directors acted with scienter."[110]

### 1. The Board's Oversight Efforts

Manifestly, the Director Defendants ensured that a system of oversight and control was in place with regard to fraud and money laundering, and, at oral argument, the Plaintiff specified that its demand futility allegations are solely grounded in the second *Caremark* prong.[111] The Plaintiff argues that "(i) there were red flags about compliance with [the DPA] during the Relevant Period, (ii) the Board and the [Compliance Committee] took absolutely no action to correct these deficiencies of which they aware [*sic*], [and] (iii) with knowledge of these deficiencies affirmatively misrepresented the effectiveness of MoneyGram's DPA compliance, which resulted in [the Amended DPA]."[112] The Complaint offers several possible red flags, including the 2009 FTC Order, the DPA, and various independent audit reports and recommendations received throughout the term of the

---

[109] *See* Sparco Aff., Ex. 14.
[110] *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017).
[111] Tr. of 9.4.20 Oral Arg. Held via Zoom on Defs.' Mot. to Dismiss 28:19–29:6.
[112] Pl.'s Opp'n Br.27, Dkt. No. 43.

DPA.[113] But the Complaint also makes clear that each of these compliance issues was brought before, and addressed by, the Board. The Board caused the Company to expend nearly $250 million on remedial measures over several years.[114] It is also noteworthy that the DPA contemplated not merely a single action, but a five-year process, during which the Company was compelled to implement multiple practices and programs. The allegations in the Complaint and documents incorporated therein acknowledge that MoneyGram took numerous actions to improve anti-fraud and AML controls and to reduce the number of fraud complaints.[115] Plaintiff alleges that the Director Defendants were unsuccessful in their attempt to comply with the DPA and eliminate fraud and money-laundering. This is true; we know from the 2018 Amended DPA that MoneyGram's improvements were insufficient to satisfy regulators, but the Complaint fails to state particularized factual allegations that the Board did nothing. A failed attempt is not itself indicative of a bad-faith attempt.

The Plaintiff clarified at oral argument that it relied on two main instances of Board misfeasance to establish bad faith. First, the Plaintiff acknowledges that MoneyGram took action, as required by the DPA, to reduce fraud by its agents, but it argues that it ignored warnings from its DPA-imposed monitor or others that it lacked a sufficiently systematic effort in that regard, and that its *ad hoc* efforts were

---

[113] *See, e.g.*, Compl. ¶¶ 69–70, 97, 100.
[114] *Id.* ¶ 149.
[115] *See, e.g.*, *id.* ¶¶ 39, 79–132.

insufficient to comply with the DPA.  In other words, the DPA left it up to the company to devise methods to prevent agent fraud; on the Defendant Directors' watch the company implemented such actions, but with insufficient speed and skill. But this allegation simply tells me the Board did a poor job applying its discretion to act; to my mind, this does not reasonably imply bad faith.

Additionally, the Plaintiff points to the implementation of the Actimize software as evidence that the Board failed to satisfy its fiduciary obligations. The Plaintiff alleges that the company was required by the DPA to apply AML software, and it chose to employ Actimize.  As the Plaintiff points out, Actimize ultimately proved unsatisfactory.  The Board was made aware of problems with Actimize— eventually, MoneyGram scrapped Actimize in favor of more efficient software.  As noted above, Actimize, despite being intended to intercept potentially fraudulent transactions, actually resulted in an increase in fraud complaints.[116]  The mere implementation of an unsuccessful program cannot support liability for lack of oversight, however. Perhaps most obviously, implementing a particular fraud reduction software demonstrates attention to risk, rather than disregard of it.  It is not reasonably conceivable under the facts pled that MoneyGram's choice to implement Actimize was made in bad faith.  There are also no allegations that

---

[116] *See, e.g., id.* ¶ 124.

MoneyGram didn't try to fix the problems with Actimize. Again, MoneyGram replaced this software in 2016.[117] Should the Board have pulled the plug sooner? Perhaps, but there is no reasonable inference of bad faith in MoneyGram's choice to implement Actimize, under the facts pled. Nothing in these facts implies scienter on the part of the Director Defendants.

### 2. Communications with the DOJ

The Plaintiff asserts, however, that the Board affirmatively concealed Actimize's deficiencies from the DOJ.[118] Obviously, if the Director Defendants took affirmative acts to mislead regulators or prosecutors, that would implicate bad faith. The Plaintiff, however, as evidence of active concealment, points out that one of the factors cited by the DOJ as leading to the Amended DPA was "the Company's inadequate disclosure of the weaknesses in the fraud interdiction system to the [DOJ]."[119] The Plaintiff notes that, in 2017 after Actimize had been replaced, counsel for MoneyGram had stated to the DOJ and MDPA its view that it had "substantially completed" the obligations under the DPA."[120] As I understand Plaintiff's argument, if you put together the facts that the company represented to the DOJ that it had complied with the DPA and that the DOJ subsequently found

---

[117] *See* Sparco Aff., Ex. 33.
[118] Pl.'s Opp'n Br. 38–39.
[119] Compl. ¶ 134.
[120] *Id.* ¶ 121.

that MoneyGram had inadequately disclosed "weakeness [with] fraud interdiction," together with the fact that four members of the Board regularly signed reports to the DOJ that did not discuss the problems with Actimize, a reasonable inference is bad-faith concealment by the Director Defendants. I disagree. A finding by the DOJ of inadequate disclosure, after the company had replaced the Actimize software, and without more, fails to amount to a particularized allegation that the Director Defendants, with scienter, misrepresented problems with Actimize to the DOJ. No particularized facts pled with respect to MoneyGram's use of Actimize implicate bad faith on the part of the Director Defendants.[121]

---

[121] The pertinent allegations in the Complaint are as follows: at a Board meeting in May of 2014, several of the Defendants were informed that Moneygram had purchased Actimize's Global Financial Crime Risk Management Platform, which was described as enabling the Company "to develop a best-in-class technology platform" for reducing financial crime; approximately one year later, the Board was informed that an internal auditor believed that one of the programs developed using Actimize was "initiated in great haste" without "some typical processes and controls" and would require enhanced monitoring and controls; later that same year, the Board was informed that another Actimize module was being implemented to monitor transactions; over two years after that, the Board discussed the failure of Actimize, which was no longer being used, in connection with potentially negotiating an extension the DPA; around this same time Board meeting minutes reflect that (1) the Board retained outside counsel to assist in negotiation with the DOJ and MDPA (in addition to the independent compliance monitor who had also been retained for this purpose); (2) the DOJ and MDPA were conducting interviews of current and former MoneyGram employees; and (3) the Board provided "significant" access to the compliance monitor. *See* Compl. ¶¶ 83, 92, 97, 118, 120, 134. Approximately one year before entering the Amended DPA, counsel for the Company stated to the DOJ and MDPA "the Corporation's view that it had substantially completed the obligations under the DPA." Compl. ¶ 121.

27

### 3. Executive Compensation

Lastly, Plaintiff points to the incentive compensation of MoneyGram's management. Because these incentives are "based on annual revenues and operating profits" they create "an improper and substantial financial incentive to discourage and undermine implementation of effective risk-based anti-fraud and AML compliance programs and to ignore noncompliance."[122] The allegation is that the Board's HRN Committee approved "rich and poorly aligned compensation packages to senior executives who presided over a decade of knowingly deficient antifraud and AML recording and reporting."[123] The Complaint does not specify any particular compensation decisions that rewarded managers despite poor performance, nor does it make any particularized factual allegation that those decisions were made in bad faith. The facts are simply insufficient to imply scienter on the part of the HRN Committee. Additionally, the HRN Committee, which oversees compensation,[124] only has four members. Thus, even if the allegations were sufficiently particular, they could not, without more, give rise to a substantial likelihood of liability for a majority of the Board that would justify excusing the demand requirement.

---

[122] *Id.* ¶ 61.
[123] *Id.* ¶ 139.
[124] *Id.* ¶ 38.

## 4. The Plaintiff Fails to Allege Inaction

In further explanation of my rationale, it is useful, I think, to examine two recent derivative cases involving the issue presented here: whether demand was excused due to likelihood of directorial liability. In *Teamsters Local 443 Health Services & Insurance Plan v. Chou*, the plaintiffs alleged that the defendant directors ignored, in bad faith, red flags revealing that a wholly-owned subsidiary was engaged in unsterile and illegal pharmaceutical distribution practices.[125] Significant corporate criminal and civil penalties ensued when these criminal activities were uncovered.[126] Critically, in that case, the complaint included specific factual allegations that in the face of several red flags the defendant directors "did nothing to correct the underlying mission critical compliance shortcomings" at the subsidiary.[127] Because it was reasonably conceivable that such a lack of oversight could lead to a substantial likelihood of liability for a majority of the board, demand was excused. The plaintiffs in *In re MetLife Inc. Derivative Litigation* similarly pled demand futility based on allegations of liability under *Caremark*.[128] In that case, the defendant directors were alleged to have ignored red flags that the company's method of notifying beneficiaries that benefits were payable was unsatisfactory,

---

[125] *Teamsters Local 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *1 (Del. Ch. Aug. 24, 2020).
[126] *Id.*, at *6–8.
[127] *Id.* at *23–24.
[128] *In re MetLife Inc. Derivative Litig.*, 2020 WL 4746635 at *1 (Del. Ch. Aug. 17, 2020).

29

which defrauded some pensioners and led to overstated earnings.[129] The revelation of this weakness resulted in private securities litigation and regulatory action.[130] As in *Teamsters*, my analysis in *MetLife* depended not on the sufficiency of what the director defendants did in response to compliance issues—no remedial action was alleged to have been taken. Instead, the question presented was whether it was reasonably conceivable that the defendant directors' *inaction* exhibited conscious disregard of their duty to act. In *Teamsters* I found that it did; in *In re MetLife* I found that it did not.

Here, by contrast, the Plaintiff does not allege that the directors did nothing, but that what they did was insufficient. The DOJ itself, in imposing the Amended DPA, concede that MoneyGram had made progress toward full compliance with the DPA during its term.[131] The Defendants acknowledge that MoneyGram's services were being used to launder money and commit fraud. In response, per the Plaintiff's own allegations, they took action. Under the facts here, it is not reasonably conceivable that the Director Defendants either disregarded a known duty to act or knowingly caused MoneyGram to violate positive law.

---

[129] *Id.*

[130] *Id.*

[131] *See* Sparco Aff., Ex. 12 ¶ 4.

### 5. <u>No Substantial Likelihood of Liability</u>

In a derivative suit, such as the one here, failure to make a demand on the board of directors of the corporation is fatal unless demand is excused. The Plaintiff did not make a demand on the board of directors before initiating this litigation, instead arguing that such a demand would have been futile. The allegations here are not that MoneyGram or its directors were committing fraud, which would be a violation of positive law that invokes bad faith. Instead, the allegation is that they were aware that others were using MoneyGram's services to commit fraud and money-laundering, and failed in their attempts to prevent it. In order for the Directors' lack of success here to invoke bad faith, the Directors would have had to ignore a clear duty to act. The facts pled here suggest a failed effort, not one opposed to the interests of MoneyGram or otherwise in bad faith. It is conceivable that a purported attempt at remediation could constitute bad faith; for instance, a mere sham remediation or an insincere action to fool regulators may be actionable. The pleading bar for such an allegation must necessarily be high. If a failed directorial attempt to remediate a problem is, because of its failure, actionable, a perverse incentive will be created. In any event, the Plaintiff here has failed to plead with the requisite particularity that the Demand Board faces a substantial likelihood of liability for this conduct under Count I.

*C. Demand is not Excused as to Count II*

The Plaintiff also does not challenge the independence of a majority of the Demand Board with respect to Count II against the Officer Defendants. The Demand Board would, accordingly, have been able to apply its business judgement to a demand. Therefore, dismissal is appropriate under Rule 23.1.

*D. Rule 12(b)(6)*

Because dismissal pursuant to 23.1 is dispositive, I need not address the Defendant's argument that the Complaint fails to state a claim under Court of Chancery Rule 12(b)(6).

### III. CONCLUSION

For the reasons stated above the Defendants' Motion to Dismiss is GRANTED. The parties shall provide an appropriate form of order.